***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Dollar. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of Deputy Commissioner Dollar.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Hartford Insurance Group was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage was $458.81, which yields a compensation rate of $305.89 per week.
5. Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer on 17 January 2002.
6. The issues for determination are:
a. Did plaintiff sustain a compensable head injury resulting in memory loss?
b. To what, if any, additional compensation is plaintiff entitled due to permanent injury?
c. Are defendants required to provide plaintiff with corrective eyeglasses?
d. Is plaintiff entitled to a second opinion by appropriate physician(s) of his choosing, regarding head injury/memory loss or vision loss?
7. The parties stipulated to the admissibility of the following documentary evidence:
a. I.C. Forms 18, 19, 22, 33 and 33R,
b. Employer Record of Earnings,
c. Plaintiff's Answers to Interrogatories,
d. Records of Dr. John H. Piland,
e. Records of Dr. Alicia M. Carroll,
f. Records of Goodman and Brooks Family Practice,
g. Loss of Vision Table,
h. Records of Dr. Walter King,
i. Records of Dr. Dale A. Menard,
j. Records of Dr. Raymond C. Sweet,
k. 6 November 2002 letter,
l. Plaintiff's Personnel file, and
m. CDL Physical Report.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a thirty-nine year old male resident of Hickory, North Carolina. He began working for defendant-employer, a manufacturer of concrete pipe, as a truck driver on or about October 17, 2001. He received treatment for headaches secondary to high blood pressure since at least 2001 from Goodman Brooks Family Practice. Plaintiff had a pre-existing major depression due to family issues related to his wife and her health problems.
2. Plaintiff's duties involved driving a tractor-trailer on a route which included Virginia, North Carolina, Georgia and South Carolina. He was required to read the bill of lading and determine the route of travel to deliver the order in an efficient manner. Plaintiff's work travel varied each day, depending on the locations to which deliveries were to be made. He unloaded the concrete pipe to the recipient and returned to the defendant-employer's site, located in Catawba, North Carolina.
3. On January 17. 2002, at approximately 9:15 a.m., plaintiff was unloading concrete pipe at a remote location in Marvin, North Carolina, when a 4" x 4" three-foot long board was knocked upward, striking him in the right eyelid. He sustained two lacerations to the eyelid as a result of the impact. However, he did not have any loss of consciousness or injury to his eye. Plaintiff got in his truck cab and put a towel on the eye, after he saw blood on his shirt and hands, but he did not look at his eye.
4. After about twenty to thirty minutes, plaintiff completed unloading his trailer; and he drove the tractor-trailer back to Catawba, North Carolina, a distance of roughly 65 miles.
5. Dispatcher Jamie Davidson was in the office when plaintiff returned to the employer on January 17, 2002. Plaintiff reported he was unloading concrete pipe and being hit in the eye when a 4 x 4 came back. He did not report losing consciousness, memory loss or disorientation.
6. Mr. Davidson observed plaintiff had two slits on his right eyelid. He told plaintiff to go to the doctor, and then reported the incident to Frances Setzer, Secretary for defendant-employer. Defendants prepared and filed an I.C. Form 19 on January 21, 2002.
7. At approximately 6:00 p.m. on the date of the injury, plaintiff presented to Graystone Ophthalmology Associates where Dr. Alicia Carroll, an ophthalmologist and reconstructive specialist examined him. Dr. Carroll repaired the two upper right eyelid lacerations. She noted plaintiff did not sustain any injury to the globe as a result of the compensable injury. Dr. Carroll authorized plaintiff to be out of work from January 18, 2002 through February 22, 2002, during which he was seen for follow-up.
8. Defendants paid plaintiff temporary total disability benefits during the period from January 18, 2002 through February 22, 2002. However, defendants did not file any writing to formally accept or deny the claim.
9. During his convalescence, plaintiff initially experienced some blurring of vision and change in his visual acuity. Dr. Carroll opined and the undersigned find plaintiff's vision changes were temporary in nature, due to the antibiotic ointment and bandage contact lens plaintiff was given to use during the healing period.
10. On January 24, 2002, plaintiff complained of numbness above his eye to the crown area to Dr. Carroll.
11. During the course of treatment for the eyelid lacerations, Dr. Carroll found plaintiff to have mild astigmatism in both eyes. The prescription for corrective lenses for this condition was not causally related to the compensable eyelid lacerations.
12. At the February 13, 2002 DOT physical exam, plaintiff denied any dizziness or loss or altered consciousness due to the right eye injury, which he reported to the examiner. He also did not report any headaches or memory problems. Plaintiff had 20/20 vision in both eyes.
13. Plaintiff returned to work on February 23, 2002. He performed his regular duties as a truck driver. Plaintiff never reported any memory problems or difficulties performing his job.
14. Plaintiff has no difficulty reading the bills of lading, preparing routes of transit, driving his tractor trailer to make deliveries in his four-state territory, maintaining the driver's log and performing daily vehicle inspections after he returned to work on February 23 2002 until the date of the hearing. Plaintiff's actual job performance contradicts his testimony about memory problems and disorientation on the job. Therefore, to the extent his post-injury conduct contradicts plaintiff's testimony regarding allegations of memory or concentration lapses, his testimony is rejected as not being credible.
15. Mike Setzer, the employer's Vice President of Operations and Safety Director, testified, and the undersigned finds as fact, plaintiff never voiced any concerns about memory problems. In fact, Mr. Setzer stated plaintiff had consistently been among the best drivers. If plaintiff had the memory deficits to which he testified, Mr. Setzer opined plaintiff would not have been able to perform the job duties on a daily basis. The first time the employer learned of plaintiff's contention he had developed memory or concentration problems was in his testimony at the hearing.
16. On March 23 2002, board certified neurologist Dr. Dale A. Menard examined plaintiff on referral from Dr. Carroll. Plaintiff complained of numbness over the right forehead to the scalp and maxillary area below the eye, blurry vision, pins and needles sensations and decreased perspiration. Following an examination, Dr. Menard diagnosed plaintiff with a dysfunction in the area of the first division of the trigeminal nerve on the right side, likely related to the traumatic injury. Dr. Menard prescribed the anticonvulsant Neurontin. A CT scan was negative for skull fracture.
17. Plaintiff reported Neurontin made his head feel swimmy before the June 28, 2002 appointment with Dr. Menard, and the dosage was modified. At the appointment, plaintiff reported having memory problems, and Dr. Menard stopped the medications and prescribed anticonvulsant Topamax.
18. On August 20, 2002, Dr. Carroll found plaintiff had a 2 mm. ptosis (or drooping) of the right eyelid, secondary to a levator muscle injury. This is a permanent impairment. She indicated it was possible plaintiff may need corrective surgery in the future, but she could not so state to a reasonable degree of medical certainty plaintiff would need surgery.
19. On September 27, 2002, plaintiff reported headaches and cognitive problems. Dr. Menard prescribed Zanaflex for headaches, which was later stopped. Reminyl and Aricept were given. Dr. Menard diagnosed plaintiff with post-concussive syndrome due to headaches, dizziness and memory problems. By January 28, 2003, Dr. Menard prescribed Pamelor, Serotonin, Reuptake and Zoloft for this.
20. On December 26, 2002, board certified neurosurgeon Dr. Raymond C. Sweet examined plaintiff, who reported a history of headaches around the right orbit posteriorly to the ear and occasional memory problems. Dr. Sweet recommended neuropsychological testing and an MRI.
21. On February 19, 2003, board certified clinical psychologist Dr. Terence Fitzgerald performed an independent psychological consultation and evaluation of plaintiff, which included several hours of testing and a one and one-half hour interview. Based upon the evaluation and debriefing, Dr. Fitzgerald found plaintiff's attention and concentration complaints related to a major depression.
22. Plaintiff has pre-existing depression which is unrelated to the injury.
23. Board certified neuropsychologist Dr. P. Jeffrey Ewert evaluated plaintiff on April 8, 2003 and ordered testing. Attention and memory testing indicated plaintiff was fully oriented and could remember remote information and had average attention and concentration. He also had a high score on the marital distress scale.
24. Dr. Ewert diagnosed plaintiff with a post-concussive disorder, despite medical evidence to the contrary. He further diagnosed plaintiff with vision impairment despite medical opinion to the contrary. As Dr. Ewert is neither a neurologist nor an ophthalmologist, he is not competent to render opinions on these conditions, which are outside his area of expertise.
25. Based upon the history of no loss of consciousness, the normal MRI results, and a review of Dr. Fitzgerald's testing, Dr. Sweet opined, and the undersigned accepts this opinion as medically competent, plaintiff did not sustain any cognitive deficits or depression as a result of the compensable eyelid lacerations.
26. Dr. Sweet distinguishes neuropsychologist Ewert's diagnosis of post-concussive syndrome. As Dr. Ewert is not a medical doctor, more weight is given to Dr. Sweet's opinion.
27. Plaintiff does not have a traumatic brain injury. There is no competent evidence to support a finding plaintiff has post-concussive syndrome as a result of the compensable injury.
28. Plaintiff sustained a permanent injury to his levator muscle and trigeminal nerve as a result of the compensable injury.
29. At the hearing, plaintiff's wife Kathy Smith misrepresented statements from Dr. Carroll and Dr. Menard regarding Mr. Smith's condition. Mrs. Smith's testimony is specifically rejected as not being credible. In addition, to the extent Dr. Ewert relied upon Mrs. Smith's version of plaintiff's condition immediately after being struck by the board in forming his opinion on plaintiff having post-concussive syndrome, his opinion is given no weight, as it is not based on credible facts in evidence.
30. Although plaintiff contends he has memory deficits, his testimony is rejected as not being credible. Specifically, he testified in detail about the dimensions of the pipes and board on the date of the injury. Furthermore, since returning to work, plaintiff has been capable of reading bills of lading, driving his tractor-trailer between his four-state area to make deliveries to various sites and return to the employer with no reported or observed problems.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and extent of disability.Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). Plaintiff has failed to prove by competent evidence he is entitled to additional temporary total disability benefits as a result of the accident. N.C. Gen. Stat. § 97-29.
2. Where the exact nature and probable genesis of a particular injury involves complicated medical questions removed from the ordinary experience of the layperson, only a qualified expert witness can give an opinion as to the nature and cause of the injury. Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980). The Commission must first determine whether the proffered expert opinion is competent before the opinion can be weighed as evidence in the case. The testimony of a medical doctor is not competent merely because it is uttered by a licensed physician. Expert opinion that rests on speculation and conjecture, or unproven facts, is not sufficiently reliable to qualify as competent evidence concerning the nature and cause of the injury. Youngv. Hickory Business Furniture, 353 N.C. 277, 538 S.E.2d 912 (2000). In the instant case, Dr. Ewert's opinion is beyond his expertise and is further reliant on an inaccurate history of the injury as related by plaintiff's wife. Therefore, his opinion is specifically rejected as not sufficiently reliable to qualify as competent evidence on the nature and cause of the injury.
3. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.1.
4. Plaintiff is entitled to have defendants pay for permanent damage to the levator muscle in the amount of $1,000.00 and for damage to the trigeminal nerve in the amount of $1,000.00. N.C. Gen. Stat. § 97-31(24).
5. Plaintiff has failed to prove that his depression is causally related to his compensable injury, and has failed to prove that he sustained a closed head injury. N.C. Gen. Stat. § 97-2(6).
6. Plaintiff is entitled to a second opinion regarding visual acuity. N.C. Gen. Stat. § 97-27(b).
7. Pursuant to I.C. Rule 801, defendants are sanctioned for failure to properly accept or deny plaintiff's claim, in accordance with N.C. Gen. Stat. § 97-18, I.C. Rule 601 and I.C. Rule 501. As an appropriate sanction, defendants shall pay plaintiff's reasonable attorney's fees related to the prosecution of this claim.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following:
 AWARD
1. Plaintiff's claims for depression and closed head injury are DENIED.
2. Defendants shall pay plaintiff permanent disability compensation in the sum of $1,000.00 as a result of permanent injury to the levator muscle and $1,000.00 as a result of permanent injury to the trigeminal nerve.
3. Defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act.
4. A reasonable attorney's fee of $500.00 is to be paid to plaintiff's counsel directly by defendants.
5. Defendants shall pay the costs, including the expert witness fee of $410.00 to Dr. P. Jeffrey Ewert.
This the ___ day of April, 2004.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER